# In the United States Court of Federal Claims

### No. 22-576C
### Filed: August 15, 2025
### Reissued for Publication: September 11, 2025[1]

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *        *
DAVINCI AIRCRAFT, INC.,                        *
                                               *
              Plaintiff,                        *
                                               *
      v.                                        *
                                               *
UNITED STATES,                                 *
                                               *
              Defendant.                        *
                                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *        *
```

**David P. Reiner, II**, Reiner & Reiner, P.A., Miami, FL, for plaintiff.

**Sosun Bae**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. With her were **L. Misha Preheim**, Assistant Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch; and **Brett A. Shumate**, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC.

# O P I N I O N

<u>**HORN, J.**</u>

Plaintiff, DaVinci Aircraft, Inc. (DaVinci), describes itself as "a California-based corporation that purchases and [sic] new and serviceable (used) surplus parts in the aviation and aerospace industries." (alteration added). After the government seized ten antennas[2] from plaintiff on September 30, 2014, DaVinci filed a complaint in the United

---

[1] This Opinion was issued under seal on August 15, 2025. The parties were asked to propose redactions prior to the public release of the Opinion. This Opinion is issued without redactions as the parties filed a submission to the court indicating "the parties have conferred and have not identified any information they believe needs to be redacted for the public version of the Court's opinion."

[2] The court notes that "antenna" may be pluralized either by adding -s or -e, and the parties use both "antennas" and "antennae" in the filings before the court. For the purposes of this

States District Court for the Central District of California on August 5, 2016. After the District Court proceedings and an appeal to the United States Court of Appeals for the Ninth Circuit, part of plaintiff's case in the District Court was subsequently transferred to the United States Court of Federal Claims and assigned to the undersigned. In this court, plaintiff now alleges breach of contract against the United States as well as a takings claim. In response, defendant has moved to dismiss plaintiff's "Second Amended Complaint"[3] in this court for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the United States Court of Federal Claims (RCFC) and for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).

**FINDINGS OF FACT**

Lockheed Martin, a prime contractor for the United States Air Force, manufactured the Air-to-Ground (AGM)-158 Joint Air-to-Surface Standoff Missile (JASSM). See DaVinci Aircraft, Inc. v. United States, 926 F.3d 1117, 1120 (9th Cir.), cert. denied, 140 S. Ct. 439 (2019). A Lockheed Martin subcontractor, Ball Aerospace & Technologies, Inc., manufactured Global Positioning System antennas for the AGM-158. See id. According to the decision issued by the United States Court of Appeals for the Ninth Circuit,[4] discussed below:

_____

Opinion, the court uses "antennas" as the plural form of antenna, but has not altered any quotations using "antennae."

[3] Plaintiff unfortunately labeled the December 5, 2022 filing in this court as the "Second Amended Complaint," although it actually is the third, amended complaint filed by plaintiff after the original complaint was filed in United States District Court for the Central District of California on August 5, 2016, an amended complaint was filed in the District Court on February 21, 2017, a transfer amended complaint was filed in the United States Court of Federal Claims on June 23, 2022, and the current post-transfer amended complaint was filed December 5, 2022. As the parties refer to the December 5, 2022 filing as the "Second Amended Complaint" in their filings, the court likewise refers to the submission filed on December 5, 2022 as the "Second Amended Complaint" to avoid further confusion in this Opinion.

[4] As addressed more fully below, plaintiff initially filed suit in the United States District Court for the Central District of California against the United States and 12 individuals for fraud, negligent misrepresentation, conspiracy, implied contract, and conversion. The District Court dismissed the tort claims against the United States for lack of jurisdiction and determined that plaintiff failed to state a claim against the individual defendants. Plaintiff filed an amended complaint in the District Court including claims for conversion, seizure of property in violation of the Fourth Amendment to the United States Constitution, deprivation of property without due process in violation of the Fifth Amendment to the United States Constitution, conspiracy related to abuse of process, and fraud, and the District Court again dismissed all the claims on April 25, 2017. See generally DaVinci Aircraft, Inc. v. United States, 2017 WL 1520418 (C.D. Cal. Apr. 25, 2017), aff'd, 926 F.3d 1117 (9th Cir.), cert. denied, 140 S. Ct. 439 (2019). On appeal to the United States Court

Under the subcontract, the Antennas were considered unclassified hardware and therefore not subject to the security requirements of the Department of Defense or U.S. Air Force for classified data and hardware. They did not require demilitarization and were authorized by the U.S. Air Force for public sale, excluding export, around March 2013.

See id.

By way of background, plaintiff alleges that "[o]n or about March 2013," Kay Kooler of the Air Force Defense Contract Management Agency (DCMA) "offered for sale ten (10) JASSM GPS antenna originally manufactured by Ball Aerospace." (alteration added). In March 2013, Avatar Unlimited made a bulk purchase of government surplus parts, including the ten antennas at issue in this case. Avatar Unlimited later sold the ten antennas to BPB Surplus for $3,500.00. On August 1, 2013, BPB Surplus sold the ten antennas to plaintiff DaVinci for $300.00 per antenna, or $3,000.00 total. Beginning in August 2013, plaintiff advertised the ten antennas for sale, asking for $125,000.00 per antenna.

Plaintiff asserts in its "Second Amended Complaint" that:

On September 17, 2013, at approximately 11:30 hours, Special Agent In Charge Laura Voyatzis, U.S. Air Force Office of Special Investigations, accompanied by Special Agents Lenora Madison, John Drapalik, and David Givernero, arrived at DaVinci's business office located in Van Nuys, California. Special Agent Voyatzis stated that their purpose was to inspect and discuss the 10 JASSM Antennae in DaVinci's possession.

After inspecting the JASSM Antennae, Special Agent in Charge Voyatzis demanded that DaVinci surrender all ten JASSM Antennae, without any legal warrant, court order, or paperwork of any kind.

DaVinci, upon advice of counsel Bob Ross, who was present, informed the Special Agents that they had no legal grounds for taking the antennae, and DaVinci refused to surrender the JASSM Antennae to the Special Agents.

---

of Appeals for the Ninth Circuit, the Ninth Circuit affirmed the District Court's April 25, 2017 decision, but remanded the case to the District Court to transfer the case, upon plaintiff's request, to the United States Court of Federal Claims. On remand, plaintiff filed a motion requesting transfer which the District Court judge granted, and the case was transferred to the United States Court of Federal Claims and assigned to the undersigned. Thereafter, in this court, plaintiff filed a transfer amended complaint, and the government filed a motion to dismiss. Subsequently, plaintiff filed a "Second Amended Complaint," which alleged breach of contract and a taking by the government, and, in response, the defendant filed another motion to dismiss the "Second Amended Complaint," which is the one now under consideration before the court.

> At the same time and place, the Special Agents asked DaVinci for a quotation of purchase price, and were informed that the asking price for the JASSM Antennae was $125,000 each. The Special Agents left without taking further action.
>
> On April 21, 2014, responding to a request from Eglin AFB [Air Force Base], DaVinci provided a price Quotation for sale of the 10 JASSM Antennae in the amount of $75,000 each. A copy of the Quotation from DaVinci dated April 21, 2014 is attached hereto as Exhibit "C" and incorporated herein by reference.
>
> On June 2, 2014, at approximately 2:37 p.m., Defendant Rodney Lewis, Capt[ain], USAF [United States Air Force], in his capacity as Contracting Officer for the United States Air Force, sent an email to Mr. Niemans in the sales department at DaVinci, thanking him for submitting the Quotation for the 10 JASSM Antennae dated Apr. 21, 2014, stating that he was interested in discussing the matter, and requesting a return call from DaVinci.

(capitalization in original; alterations added; internal references omitted). On June 2, 2014, United States Air Force Captain, and contracting officer, Rodney Lewis emailed plaintiff's Sales Department stating: "The government would like to extend an offer of $7,359 for the purchase of the 10 JASSM GPS Antennas. This is based on the price originally paid for the purchase of the lot of military equipment from DCMA. We're looking forward to hearing from you." On June 4, 2014, Captain Lewis emailed Leonardo Parra, owner of DaVinci, stating: "I have been assigned the purchase of the GPS Antennas in your possession. I recently emailed the address on the quotation, but haven't received a response. Please review the email below and let me know how you would like to proceed." (capitalization in original). That same day, June 4, 2014, Erik Niemans, of plaintiff's Sales Department, replied to Captain Lewis by email, stating:

> We sent an email a few days ago responding to your offer. $75,000.00 each is the best price we are going to be able to go on these antennas; that is the price after giving the USAF a 40% discount off the price we were originally quoting these units out at. $7,359.00 for the lot of 10 antennas is just far too low to consider.

Also that same day, Captain Lewis sent the following reply:

> I'm sure you understand that the government must determine the prices it pays for parts to be fair and reasonable as the taxpayer depends on us to be good stewards of their dollars. Seeing that these units only cost a fraction of that amount brand new, the government is unwilling and unable to accept that price. I encourage you to propose a more reasonable price so we both can benefit.

On June 11, 2014, Brandi Clark of the United States Air Force Materiel Command, Air Force Life Cycle Management Center, emailed Mr. Niemans and copied Captain Lewis, stating: "I wanted [sic] follow up with you regarding Capt. Lewis' last email concerning the JASSM GPS Antennas. I was wondering if the Government can expect a fair counter offer [sic] from DaVinci Aircraft in the near future." (capitalization in original; alterations added).

> Plaintiff further alleges in its "Second Amended Complaint:"

> On or about June 11, 2014, DaVinci received a telephone call from Capt. Rodney Lewis, Department of the Air Force. Capt. Lewis stated that the Air Force was in "urgent need" of the JASSM Antennae and asked DaVinci for a price quotation. DaVinci responded with a verbal price quotation of $125,000 each, for the 10 JASSM Antennae owned by DaVinci. Capt. Lewis replied that the price quoted by DaVinci was too high, and that the Antennae were not worth that amount of money as they were "no good."

Plaintiff also alleges that, on June 11, 2014:

> Capt. Lewis sent an email to DaVinci requesting a written price quotation for the 10 JASSM Antennae. 29. [sic] On June 11, 2014, in response to Capt. Lewis' email request, DaVinci prepared and sent a written Quotation to Eglin AFB [Air Force Base], listing the full purchase price for the 10 JASSM Antennae at $125,000,000, [sic] and offering a 52% discount for a final price of $600,000. A true and correct copy of the Quotation dated June 11, 2014 is attached hereto as Exhibit "E" and incorporated herein by this reference.

(alterations added). In the "Second Amended Complaint," plaintiff alleges DaVinci "received no response to the written Quotation dated June 11, 2014." The next day, June 12, 2014, Brandi Clark sent another email to Mr. Niemans, copying Captain Lewis, stating: "I did not receive the revised offer that we talked about on the phone yesterday. Please forward a copy to Capt Lewis and myself at your earliest convenience." Four days later, on June 16, 2014, Captain Lewis sent the following email to Mr. Niemans and Brandi Clark:

> Brandi [Clark] has been working this purchase for me and is out of the office for the next two weeks. I just wanted to touch base and make sure the quote is not lost in the webisphere. We have not received an updated quote from you. Please include me on the email since Brandi is out of the office.

(alteration added). On July 22, 2014, Lieutenant Colonel Stephen Russell drafted a memorandum[5] that stated:

---

[5] Lieutenant Colonel Russell's July 22, 2014 Memorandum was not attached to any of plaintiff's complaints filed in the United States District Court for the Central District of California or in this court. The July 22, 2014 Memorandum, however, was part of the record in the United States District Court for the Central District of California, mentioned above and discussed below.

I am the Director of Air Force Special Programs and have been designated as the Original Classification Authority (OCA) for SENIOR RODEO under the authority of Executive Order 13526 as delegated by the Secretary of the Air Force. Based upon an AFOSI [Air Force Office of Special Investigations] request, and in my capacity as OCA official, I have coordinated with the appropriate technical experts and reviewed the documents and references in accordance with the SENIOR RODEO Security Classification Guide (SCG), dated 31 Oct 2007[6]. I have determined the embedded features of the JASSM GPS Antennas are classified at the SECRET and SECRET//SPECIAL ACCESS REQUIRED level and that their disclosure could provide adversarial nations with critically protected information. This information would facilitate foreign technology development and accelerate foreign development of low observable apertures.

(capitalization in original; footnote and alteration added).

Plaintiff also alleges that on September 30, 2014, "Special Agent Joel S. Russell, Office of Special Investigations, accompanied by two Air Force Officers, arrived at DaVinci's business location in Van Nuys, California, and demanded that DaVinci surrender the 10 JASSM Antennae, under compulsion of law." Special Agent Russell presented a letter dated September 23, 2014 to plaintiff, which was signed by Special Agent Michael Christmas, Special Agent in Charge, Air Force Office of Special Investigations, Special Projects, Detachment 3, and which includes a concurrence signature from Captain Lewis. The September 23, 2014 Letter stated:

The undersigned, being fully authorized to take possession of the following identified items being claimed as constituting or consisting of "information relating to the national defense" acknowledges receipt of ten (10) JASSM antennae - from Leonardo Parra and DaVinci Aircraft. The undersigned further acknowledges that the delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793 (d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value.

(alteration added). According to plaintiff's "Second Amended Complaint:"

On September 30, 2014, pursuant to the demands and threats made by Special Agent Russell to provide the JASSM Antennae under compulsion of law pursuant to 18 USC [sic] 793(d),[7] including the threat of criminal

---

[6] The defendant did not provide this court with the "SENIOR RODEO Security Classification Guide." (capitalization in original).

[7] The statute at 18 U.S.C. § 793(d), part of Title 18 of the United States Code, "Crimes and Criminal Procedure," in effect in 2014, states:

prosecution for any failure to comply, Plaintiff DaVinci surrendered the 10 JASSM Antennae to Special Agent Russell.

(alteration and footnote added). Special Agent Russell signed a September 30, 2014 receipt for the antennas, which stated:

**RECEIPT FOR ITEMS TAKEN UNDER COMPULSION**

The undersigned acknowledges receipt of the following items from Leonardo Parra and Da Vinci Aircraft, Inc. received on September 30, 2014:

Ten (10) JASSM / GPS antennae, part number 305464-501:

Serial numbers:

042, 89957
052, 89921
027, 89952
051, 89928
030, 89927
028, 89930
001, 89916
011, 89918
012, 89936
029, 89956

The above items were received in good order and condition.

(capitalization and emphasis in original).

--------------------------

Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it.

18 U.S.C. § 793(d) (2013).

Procedural History

As noted above, on August 5, 2016, DaVinci filed a complaint in the United States District Court for the Central District of California, identifying two named individuals, ten unnamed individuals, and the United States of America as defendants. Plaintiff's original complaint alleged

> a criminal enterprise and conspiracy on the part of Defendants, agents of the United States Air Force, to obtain 10 JASSM GPS Antennae without compensation to the legal owner, Plaintiff, by fraudulently inducing and compelling Plaintiff, under threat of criminal prosecution pursuant to 18 U.S.C. [sic] 793 (the Espionage Act), to surrender the JASSM Antennae.

(capitalization in original; alteration added).

As explained by the United States Court of Appeals for the Ninth Circuit, on appeal from the United States District Court for the Central District of California, plaintiff's complaint in the District Court sought "damages under the Federal Tort Claims Act ('FTCA'), ch. 753, Title IV, 60 Stat. 842 (codified as amended in scattered sections of 28 U.S.C.), and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)." DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1120. In its decision, the Ninth Circuit noted that in the United States District Court for the Central District of California, the government

> filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The United States argued that the district court lacked jurisdiction over DaVinci's tort claims because the confiscation fell into an exception of the FTCA's waiver of its sovereign immunity. In support of its assertion, the government submitted a declaration from Martin D. Hemmingsen, Program Element Monitor for Air Force Special Programs, attesting that in July 2014, the Antennas were classified as "SECRET" and "SECRET/SPECIAL ACCESS REQUIRED" level in accordance with Executive Order 13,526 [, 75 Fed. Reg. 707 (Dec. 29, 2009)]. The court concluded that it lacked jurisdiction over DaVinci's tort claims against the United States and that DaVinci failed to state a Bivens claim against the individual defendants, and dismissed all claims without prejudice.

DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1121 (capitalization in original; footnote omitted; alteration added). The Ninth Circuit continued,

> DaVinci filed a First Amended Complaint against the United States, Christmas, Lewis, Russell, and 10 unnamed defendants. This time, all of the individual defendants were sued in their individual capacities. DaVinci asserted six causes of action against all defendants: (1) conversion, (2) seizure of property in violation of the Fourth Amendment, (3) deprivation of property without due process in violation of the Fifth Amendment, (4)

conspiracy related to abuse of process, (5) fraud, and (6) negligent misrepresentation. The United States responded with another motion to dismiss under Rules 12(b)(1) and 12(b)(6).

DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1121-22 (alterations added; footnote omitted). The Ninth Circuit also explained that the United States District Court for the Central District of California also had dismissed plaintiff's first amended complaint, concluding that the District Court for the Central District of California

lacked jurisdiction over DaVinci's FTCA claims of fraud, negligent misrepresentation, and conspiracy to commit fraud or misrepresentation because 28 U.S.C. § 2680(h) provides an absolute bar to such claims. The district court also held that it lacked jurisdiction over DaVinci's abuse of process and conversion claims because of the FTCA's "detention of goods" exception under 28 U.S.C. § 2680(c). Relying on the 2014 Christmas letter and 2016 Hemmingsen declaration, the district court noted that it could not review the Air Force's decision to classify the Antennas as relating to the national defense because such classification was a discretionary decision, triggering the "discretionary function" bar under 28 U.S.C. § 2680(a). Lastly, the district court held that Bivens did not provide a cause of action against the United States, and therefore dismissed DaVinci's two constitutional claims against the United States.

DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1122 (footnote omitted).

In its decision, the Ninth Circuit observed that "DaVinci dismissed the action without prejudice against Christmas, Russell and Lewis" in the United States District Court for the Central District of California and "timely appealed" the District Court's decision to the Ninth Circuit. See id. In its decision on appeal from the United States District Court for the Central District of California's dismissal of DaVinci's first amended complaint, the Ninth Circuit stated:

As the Supreme Court discussed in Kosak [v. United States, 465 U.S. 848 (1984)], one rationale for an expansive interpretation of the FTCA exceptions is that Congress did not intend the FTCA to provide recovery where "adequate remedies were already available." 465 U.S. at 858, 104 S. Ct. 1519. The Tucker Act has long provided a venue for claims like the one DaVinci brings here. See 28 U.S.C. § 1491(a)(1) (providing for jurisdiction in the Court of Federal Claims for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." (emphasis added)). In fact, the district court noted that claims like DaVinci's—claims against the United States for compensation or the return of materials seized pursuant to 18 U.S.C. § 793(d)—have been brought in the Court of Federal Claims as breaches of implied or express

contracts. Critically, the Supreme Court has explicitly held that the detention of goods exception from 28 U.S.C. § 2680(c) does not apply to the Tucker Act. See Hatzlachh Supply Co. v. United States, 444 U.S. 460, 466, 100 S. Ct. 647, 62 L. Ed. 2d 614 (1980).

DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1126–27 (emphasis in original; alteration added).[8] The Ninth Circuit suggested "DaVinci could proceed in the Court of Federal Claims under the Tucker Act through a takings claim under the Fifth Amendment." Id. at 1127.

The Ninth Circuit concluded:

The saga over the seizure of DaVinci's Antennas illustrates a tension arising out of our FTCA cases. On the one hand, we are instructed to construe statutes waiving the government's sovereign immunity strictly in favor of the sovereign. Yet we must also be wary of reading exemptions so broadly that the FTCA exceptions swallow up the statute and leave no recourse for plaintiffs like DaVinci. Notwithstanding where the Antennas are today, DaVinci may have a remedy, even if limited, in the Court of Federal Claims.

---

[8] The Ninth Circuit also observed:

The Court of Federal Claims' opinion in Ast/Servo Systems, Inc. v. United States contained strikingly similar facts to DaVinci's situation. 449 F.2d 789, 789[, 196 Ct. Cl. 150, 151] (Ct. Cl. 1971). In Ast/Servo Systems, Inc., the Air Force mistakenly sold through a public sale surplus governmental material, specifically guidance sets, which the plaintiff bought from the original purchasers for $ 65-300 apiece and then offered for sale at a 10-50 times markup. Id. at 789. The Air Force subsequently informed the plaintiff that the guidance sets "relat[ed] to the national defense" under the Espionage Act, and demanded immediate return of the equipment. Id. at 789–90. The plaintiff complied and then brought suit for "just compensation" in the amount of the sales price it had marked up. Id. at 790. Applying principles of contract law, the court held that the plaintiff could not recover "just compensation" because the original Air Force sale was a mistake, thereby voiding the original contract, id. at 791–92, but that the plaintiff could seek actual out-of-pocket costs, id. at 792. See also Int'l. Air Response v. United States, 75 Fed. Cl. 604, 614 (2007) ("[E]ven if the Espionage Act did apply, plaintiff would be entitled to compensation for its 'actual expenditures.'" (quoting Ast/Servo Systems, Inc., 449 F.2d at 790)). Thus, at the very least, DaVinci could seek reimbursement for the price it paid for the Antennas at the Court of Federal Claims.

DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1126–27 (first alteration added). The court notes that Ast/Servo Systems, Inc. v. United States was decided by the United States Court of Claims.

> Therefore, we affirm the judgment of the district court and remand this case
> with instructions that, if DaVinci so requests, the court shall transfer this
> action to the Court of Federal Claims pursuant to 28 U.S.C. § 1631.

DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1128 (capitalization in original).

On remand from the Ninth Circuit, the District Court for the Central District of California granted plaintiff's motion to transfer the case to the United States Court of Federal Claims, where the case was assigned to the undersigned, and on June 23, 2022, plaintiff filed a "Transfer (Amended) Complaint." Subsequently, on December 5, 2022, with the leave of the undersigned, plaintiff filed what it denominated its "Second Amended Complaint" in this court. Plaintiff's "Second Amended Complaint" identifies three claims for relief: (1) "BREACH OF EXPRESS CONTRACT," (2) "BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)," and (3) a "TAKINGS CLAIM UNDER [the] FIFTH AMENDMENT" to the United States Constitution. (capitalization in original; alteration added). Plaintiff seeks judgment against the United States "for the full purchase price of $1,250,000 for 10 JASSM Antennae at $125,000.00 each, prejudgment interest, reasonable attorney fees and court costs per contract and customs; all additional costs of suit incurred herein; and for such other and further relief as the Court deems just and proper."

In response, defendant filed a motion to dismiss plaintiff's "Second Amended Complaint" for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). Defendant argues the court should dismiss the plaintiff's contract claims and takings claim included in plaintiff's "Second Amended Complaint." Defendant argues "DaVinci's original and amended district court complaints both did not assert a takings claim" and, therefore, plaintiff's takings claim "does not relate back to DaVinci's district court complaints."

In response, plaintiff argues that "[t]he allegations are that Plaintiff purchased the JASSM Antennas on or about August 1, 2013. The JASSM Antennas did not require demilitarization and were authorized for public sale, excluding export. Crucially, the JASSM Antennas were not determined to be classified until July 22, 2014." (alteration added; internal reference omitted). Plaintiff claims that "plaintiff merely seeks just compensation or fair market value," and argues "Plaintiff was an innocent purchaser for value, and Plaintiff's original purchase was legal and valid." (internal reference omitted). Plaintiff argues that "[t]he communications between the parties clearly evidence that Contracting Officer Rodney Lewis' assignment was to purchase the JASSM Antennas from Plaintiff," and the "parties entered into a valid and enforceable contract as evidenced by the parties' negotiations, the September 23, 2014 letter which was signed by Contracting Officer Rodney Lewis, and by Plaintiff's subsequent performance." (emphasis in original; internal reference omitted; alteration added). Separately, plaintiff argues "Plaintiff's takings claim arises out of the same exact factual circumstances as its previous complaints. The only additional allegations are either legal conclusions or legal elements of the newly asserted claim."

In its reply brief, defendant argues that the "government's seizure of the JASSM Antennas was not a contract to purchase the JASSM Antennas," and "DaVinci had no right to retain possession of the JASSM Antennas." Attached to defendant's reply brief, defendant provided the March 2, 2023 Declaration of Colonel Brian Bohenek. In this declaration, Colonel Bohenek states that "the JASSM program was first approved and promulgated on October 31, 2007" and that the "same critical program information classified as SECRET in October 2007, has remained classified, continuously and without interruption, from 2007 to the present." Pursuant to this declaration, defendant asserts that the "allegation that information contained in the JASSM Antennas was not classified until July 22, 2014 is not in DaVinci's complaint, and also is incorrect" and "that the JASSM Antennas were required to be demilitarized, and that they were destroyed after being seized." (internal citation omitted). Defendant's motion to dismiss has been fully briefed and oral argument was held.

## DISCUSSION

Plaintiff's "Second Amended Complaint" in this court pleads both contract claims and a takings claim. The court notes although a plaintiff may simultaneously allege in its complaint breach of contract claims and takings claims, interference with a right created by contract "generally gives rise to a breach claim not a taking claim." Sun Oil Co. v. United States, 215, Ct. Cl. 716, 770, 572 F.2d 786, 818 (1978). "It is well established that, generally, governmental interference with a contractual right does not give rise to a taking, but instead entitles a plaintiff to seek compensation for breach of contract." Bailey v. United States, 53 Fed. Cl. 251, 256 (2002); see also Barlow & Haun, Inc. v. United States, 87 Fed. Cl. 428, 438 (2009) ("Ordinarily, the Government's interference with contractual rights arising under a contract with the Government will give rise to a breach of contract action, rather than a taking claim."). As explained by a Judge of the United States Court of Federal Claims "a Fifth Amendment takings claim is not viable when the parties' rights and obligations are governed by contract." Sonoma Apartment Assocs. v. United States, 124 Fed. Cl. 595, 600 (2015); see also Tamerlane, Ltd. v. United States, 80 Fed. Cl. 724, 738 (2008) ("Although rights existing independently of a contract may be brought pursuant to a takings claim, when a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking.") (citation omitted); Allegre Villa v. United States, 60 Fed. Cl. 11, 18 (2004) ("When a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking."). When a plaintiff alleges a breach of contract claim and a takings claim, the court first will consider whether a viable contract claim exists because "[i]t has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue." Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1368 (Fed. Cir. 2009) (alteration added); see also City Line Joint Venture v. United States, 503 F.3d 1319, 1323 (Fed. Cir. 2007) ("When a viable contract claim exists, we should not reach out to decide the takings issue. Clearly, there should not be double recovery, we should not commingle takings compensation and contract damages."); PGB Hanger, LLC v. United States, 170 Fed. Cl.

473, 481 (2024). "If the right at issue is not governed by the terms of the parties' contract, plaintiffs may pursue a takings action." <u>Allegre Villa v. United States</u>, 60 Fed. Cl. at 18.

The United States Court of Appeals for the Federal Circuit has held "that when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." <u>Piszel v. United States</u>, 833 F.3d 1366, 1376 (Fed. Cir. 2016). "Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." <u>Hughes Commc'n Galaxy, Inc. v. United States</u>, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (internal citations omitted); <u>see also</u> <u>A & D Auto Sales, Inc. v. United States</u>, 748 F.3d 1142, 1156 (Fed. Cir. 2014) (explaining that remedies available under a breach of contract theory make takings liability redundant); <u>St. Christopher Assocs., L.P. v. United States</u>, 511 F.3d 1376, 1385 (Fed. Cir. 2008) ("In general, takings claims do not arise under a government contract because, as stated by the Court of Federal Claims, the government is acting in its proprietary rather than its sovereign capacity, and because remedies are provided by the contract.").

Defendant has moved to dismiss plaintiff's "Second Amended Complaint" both the contract claims and the takings claim. This court first considers defendant's motion to dismiss the contract claims. Initially, defendant moves to dismiss Count I, breach of express contract, and Count II, breach of implied contract, in plaintiff's "Second Amended Complaint" for lack of subject matter jurisdiction. "Subject-matter jurisdiction may be challenged at any time by the parties or by the court <u>sua sponte</u>." <u>Folden v. United States</u>, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing <u>Fanning, Phillips & Molnar v. West</u>, 160 F.3d 717, 720 (Fed. Cir. 1998)), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2004), <u>cert.</u> <u>denied</u>, 545 U.S. 1127 (2005); <u>see also</u> <u>ECC Int'l Constructors, LLC v. Sec'y of Army</u>, 79 F.4th 1364, 1368 (Fed. Cir. 2023) ("courts must enforce jurisdictional rules <u>sua sponte</u>, even in the face of a litigant's forfeiture or waiver"); <u>St. Bernard Par. Gov't v. United States</u>, 916 F.3d 987, 992-93 (Fed. Cir. 2019) ("[T]he court must address jurisdictional issues, even <u>sua sponte</u>, whenever those issues come to the court's attention, whether raised by a party or not, and even if the parties affirmatively urge the court to exercise jurisdiction over the case." (citing <u>Foster v. Chatman</u>, 578 U.S. 488, 496 (2016) (alteration added)); <u>Int'l Elec. Tech. Corp. v. Hughes Aircraft Co.</u>, 476 F.3d 1329, 1330 (Fed. Cir. 2007); <u>Haddad v. United States</u>, 152 Fed. Cl. 1, 16 (2021); <u>Fanelli v. United States</u>, 146 Fed. Cl. 462, 466 (2020). The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2024). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a

refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); see also Me. Cmty. Health Options v. United States, 590 U.S. 296, 322-323 (2020); United States v. Mitchell, 463 U.S. 206, 216 (1983); Sanford Health Plan v. United States, 969 F.3d 1370, 1378 (Fed. Cir. 2020); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Gulley v. United States, 150 Fed. Cl. 405, 411 (2020); Kuntz v. United States, 141 Fed. Cl. 713, 717 (2019). "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216-17 (omission added); see also Chemehuevi Indian Tribe v. United States, 104 F.4th 1314, 1321 (Fed. Cir. 2024) ("'For jurisdiction to lie under the Tucker Act, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum."'" (quoting Doe v. United States, 100 F.3d 1576, 1579 (Fed. Cir. 1996) (quoting Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605, 372 F.2d 1002, 1008 (1967)), reh'g denied and en banc suggestion denied (Fed. Cir. 1997))); United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Allen v. United States, 88 F.4th 983, 986 (Fed. Cir. 2023) ("The Tucker Act does not create substantive rights, so a plaintiff filing in the Court of Federal Claims 'must identify a separate source of substantive law that creates the right to money damages.' . . . '[T]he absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act.'" (quoting Fisher v. United States, 402 F.3d 1167, 1172-73 (Fed. Cir. 2005) (omission added; alterations in original))); N.Y. & Presbyterian Hosp. v. United States, 881 F.3d 877, 881 (Fed. Cir. 2018); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 571 U.S. 945 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[P]laintiff must look beyond the Tucker Act to identify a substantive source of law that creates the right to recovery of money damages against the United States.") (alteration added); Olson v. United States, 152 Fed. Cl. 33, 40-41 (2021); Jackson v. United States, 143 Fed. Cl. 242, 245 (2019), appeal dismissed, 2020 WL 8254415 (Fed. Cir. 2020). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims:

> The underlying monetary claims are of three types . . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver . . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third,

the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [(1976)] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004) (alterations and first two omissions added); see also Bell v. United States, 20 F.4th 768, 770 (Fed. Cir. 2021); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 9-10 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2025); Fed. R. Civ. P. 8(a)(1), (2) (2025); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57, 570 (2007)); Bd. Of Supervisors of Issaquena Cnty., Miss. v. United States, 84 F.4th 1359, 1364 (Fed. Cir. 2023) ("To survive a motion to dismiss, 'the complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.''") (quoting A & D Auto Sales, Inc. v. United States, 748 F.3d at 1157 (quoting Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. v. Twombly, 550 U.S. at 570)). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998) (alteration added); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. WRIGHT AND A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1286 (3d ed. 2004)); "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014); see also Hale v. United States, 143 Fed. Cl. 180, 190 (2019). As stated in Ashcroft v. Iqbal, "[a] pleading that offers

'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555) (first alteration added).

In addition to arguing that plaintiff's claims must be dismissed for lack of subject matter jurisdiction, defendant also argues that plaintiff's claims must be dismissed for failure to state a claim. When examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see also Bell Atl. Corp. v. Twombly, 550 U.S. at 555. The United States Supreme Court has stated:

> While a complaint attacked by Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid. [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. Of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure §1216 pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Nietzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim that relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); First Mortg. Corp. v. United States, 961 F.3d 1331, 1339 (Fed. Cir. 2020); Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380 (Fed. Cir. 2019); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d at 1157; Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied, (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed.

Cir.), <u>cert. denied</u>, 562 U.S. 830 (2010); <u>Bank of Guam v. United States</u>, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 545, 557)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2009), <u>cert. denied</u>, 561 U.S. 1006 (2010); <u>Cambridge v. United States</u>, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 544)); <u>Cary v. United States</u>, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555, 570)), <u>reh'g denied</u> (Fed. Cir.), <u>cert. denied</u>, 557 U.S. 937 (2009); <u>Christen v. United States</u>, 133 Fed. Cl. 226, 229 (2017); <u>Christian v. United States</u>, 131 Fed. Cl. 134, 144 (2017); <u>Vargas v. United States</u>, 114 Fed. Cl. 226, 232 (2014); <u>Fredericksburg Non-Profit Hous. Corp. v. United States</u>, 113 Fed. Cl. 244, 253 (2013), <u>aff'd</u>, 579 F. App'x 1004 (Fed. Cir. 2014); <u>Peninsula Grp. Cap. Corp. v. United States</u>, 93 Fed. Cl. 720, 726-27 (2010); <u>Legal Aid Soc'y of N.Y. v. United States</u>, 92 Fed. Cl. 285, 292, 298 n.14 (2010). "It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) 'when the facts asserted by the claimant do not entitle him to a legal remedy.'" <u>Wild v. United States</u>, 162 Fed. Cl. 67, 70–71 (2022) (quoting <u>Lindsay v. United States</u>, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

Regarding both Count I, breach of express contract and Count II, breach of implied contract in plaintiff's "Second Amended Complaint," to have privity of contract with the United States government, and, therefore, to invoke jurisdiction in the United States Court of Federal Claims for an alleged breach of contract claim, plaintiff "must show that either an express or implied-in-fact contract underlies [the] claim." <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (alteration added); <u>see also</u> <u>Park Props. Assocs., L.P. v. United States</u>, 916 F.3d 998, 1002 (Fed. Cir. 2019), <u>cert. denied</u>, 140 S. Ct. 857 (2020). "An express contract '"must be manifested by words, either oral or written, which contains agreement and/or mutual assent."'" <u>Frankel v. United States</u>, 118 Fed. Cl. 332, 335 (2014) (quoting <u>Essen Mall Props. v. United States</u>, 21 Cl. Ct. 430, 439 (1990) (quoting <u>Webster Univ. v. United States</u>, 20 Cl. Ct. 429, 433 (1990))), <u>aff'd</u>, 842 F.3d 1246 (Fed. Cir. 2016).

As recently explained by the United States Court of Appeals for the Federal Circuit:

There are four requirements to form a contract with the Government: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." <u>Anderson v. United States</u>, 344 F.3d 1343, 1353 (Fed. Cir. 2003). These elements apply to both express and implied-in-fact contracts.

Boyd v. United States, 134 F.4th 1348, 1352 (Fed. Cir. 2025); see also Fairholme Funds, Inc. v. United States, 26 F.4th 1274, 1293-94 (Fed. Cir. 2022), cert. denied, 143 S. Ct. 563 (2023); Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1339 (Fed. Cir. 2021); Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1381 (Fed. Cir. 2019); Bank of Guam v. United States, 578 F.3d at 1326 (quoting Trauma Serv. Grp. v. United States, 104 F.3d at 1325); see also Chattler v. United States, 632 F.3d 1324, 1330 (Fed. Cir. 2011) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325); Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006), cert. denied, 550 U.S. 934 (2007); Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("Thus, the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."); City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998); San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); Stanwyck v. United States, 127 Fed. Cl. 308, 312 (2016); Yifrach v. United States, 145 Fed. Cl. 691, 698 (2019), aff'd, 825 F. App'x 899 (Fed. Cir. 2020); Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. 760, 767 (2014); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 492 (2013); Council for Tribal Emp. Rts. v. United States, 112 Fed. Cl. 231, 243 (2013), aff'd, 556 F. App'x 965 (Fed. Cir. 2014); BioFunction, LLC v. United States, 92 Fed. Cl. 167, 172 (2010); Mastrolia v. United States, 91 Fed. Cl. 369, 384 (2010) (citing Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005)); see also Trauma Serv. Grp. v. United States, 104 F.3d at 1325; Weeks v. United States, 124 Fed. Cl. 630, 633 (2016); Vargas v. United States, 114 Fed. Cl. at 233; Prairie Cnty., Mont. v. United States, 113 Fed. Cl. 194, 202 (2013), aff'd, 782 F.3d 685 (Fed. Cir.), cert. denied, 577 U.S. 923 (2015); Cal. Hum. Dev. Corp. v. United States, 87 Fed. Cl. 282, 293 (2009), aff'd, 379 F. App'x 979 (Fed. Cir. 2010); Aboo v. United States, 86 Fed. Cl. 618, 629, aff'd, 347 F. App'x 581 (Fed. Cir. 2009); SGS-92-X003 v. United States, 74 Fed. Cl. 637, 653–54 (2007); Arakaki v. United States, 71 Fed. Cl. 509, 514 (2006), aff'd, 228 F. App'x 1003 (Fed. Cir. 2007); Fincke v. United States, 675 F.2d 289, 295 (Ct. Cl. 1982); Russell Corp. v. United States, 210 Ct. Cl. at 609. In contract formation with the government, "the law requires that a Government agent who purports to enter into or ratify a contractual agreement that is to bind the United States have actual authority to do so." Monarch Assur. P.L.C. v. United States, 244 F.3d 1356, 1360 (Fed. Cir. 2001), reh'g and reh'g en banc denied (Fed. Cir. 2001) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325). "The corollary is that any party entering into an agreement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government . . . ." Id. (citing Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380) (omission added); see also Snyder & Assocs. Acquisitions LLC v. United States, 133 Fed. Cl. 120, 126 (2017).

Regarding an implied-in-fact contract, the United States Court of Appeals for the Federal Circuit has explained:

An implied-in-fact agreement must be "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." For contracts with the United States, however, an implied-in-fact contract—just as an express contract—

18

requires an authorized agent of the Government. Further, an implied-in-fact contract cannot exist if an express contract already covers the same subject matter.

Trauma Serv. Grp. v. United States, 104 F.3d at 1326 (citations omitted).

Defendant's motion to dismiss plaintiff's "Second Amended Complaint" initially argues that "Counts I and II of the Second Amended Complaint should be dismissed for lack of jurisdiction because DaVinci has failed to plead facts that would amount to either an express or an implied-in-fact contract with the Government, and therefore these counts are not within this Court's Tucker Act jurisdiction." In its "Second Amended Complaint," plaintiff claims that DaVinci and "the government entered into a contract for the purchase of 10 JASSM Antennae at $125,000.00 each, and ultimately offering a 52% discount for a final price of $600,000 as evidenced by the quotes, invoices and emails attached hereto as Exhibits." In plaintiff's response to defendant's motion to dismiss, however, plaintiff argues that "[w]ith respect to an express contract, Plaintiff contends that the September 24, 2014 [sic] letter, considering the parties' prior negotiations, was an offer.[9] (alterations added). At the oral argument, the court asked plaintiff's counsel: "What is your offer and what is your acceptance as documented in the record?" Referencing Exhibits F and G of the "Second Amended Complaint," which are the September 23, 2014 Letter and the September 30, 2014 Receipt for Items Taken, respectively, plaintiff's counsel answered that

> they're basically stating in those documents [Exhibit F of the "Second Amended Complaint," the September 23, 2014 Letter, and Exhibit G of the "Second Amended Complaint," the September 30, 2014 Receipt for Items Taken], they're stating we're going to take the -- we're going to take the antennas, and you're entitled to compensation, and then Exhibit G is, okay, take the -- take the antennas. So that is it. The rest of the communication back and forth -- the rest of the communications back and forth over the prior months were simply negotiations.

(alteration added). Plaintiff's counsel continued:

> And I get that there is a major difference between what's being offered initially and what was -- what my client was willing to accept, and that's -- that is a matter for another day, you know, what the exact number is. But at the end of the day, after the antennas were taken, despite the fact that there were these letters and there's a letter saying that you're entitled to claims for just compensation, after that, there was a brick wall, there was you're not entitled to anything under a takings, there's no contract here, and there's nothing.

---

[9] Plaintiff appears to mean the letter dated September 23, 2014 signed by Special Agent in Charge Christmas with a concurrence signature from Captain Lewis.

Plaintiff further argues, in its response to defendant's motion to dismiss, that:

> As alleged in paragraphs 13-16[10] of the Second Amended Complaint, Plaintiff had previously refused Defendant's attempted seizure of the JASSM Antennas, but the promise of fair market value is what caused Plaintiff to accede to the taking on September 30, 2014. At no point prior to September 30, 2014 did Defendant communicate to Plaintiff that the purchase which the parties intended to consummate was no longer on the table due to the JASSM Antennas' reclassification or for any other reason.

(capitalization in original; footnote added). In plaintiff's "Second Amended Complaint," regarding its claim for the "promise of fair market value," plaintiff references the September 23, 2014 Letter to allege: "The letter specifically acknowledges that 'delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793(d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value.'" (alteration added). In its response to the motion to dismiss, plaintiff argues: "Given Defendant's repeated statements regarding purchase, the parties' previous negotiations regarding price, and having received a letter requiring immediate delivery in exchange for Defendant's acknowledgement that the delivery would not prejudice its claim for fair market value, Plaintiff voluntarily surrendered the JASSM Antennas which constituted either acceptance or performance." (capitalization in original). During the oral argument plaintiff's counsel also indicated that the antennas

---

[10] Plaintiff's "Second Amended Complaint" at paragraphs 13-16 alleges:

> 13. On September 17, 2013, at approximately 11:30 hours, Special Agent In Charge Laura Voyatzis, U.S. Air Force Office of Special Investigations, accompanied by Special Agents Lenora Madison, John Drapalik, and David Givernero, arrived at DaVinci's business office located in Van Nuys, California. Special Agent Voyatzis stated that their purpose was to inspect and discuss the 10 JASSM Antennae in DaVinci's possession.

> 14. After inspecting the JASSM Antennae, Special Agent in Charge Voyatzis demanded that DaVinci surrender all ten JASSM Antennae, without any legal warrant, court order, or paperwork of any kind.

> 15. DaVinci, upon advice of counsel Bob Ross, who was present, informed the Special Agents that they had no legal grounds for taking the antennae, and DaVinci refused to surrender the JASSM Antennae to the Special Agents.

> 16. At the same time and place, the Special Agents asked DaVinci for a quotation of purchase price, and were informed that the asking price for the JASSM Antennae was $125,000 each. The Special Agents left without taking further action.

> were turned over under compulsion, and there were some potential threats of criminal, you know, charges or whatever if they didn't do what they were being asked to do, so there was some duress there, but, still, they do go ahead and accept that agreement. I mean, they had no other choice really. They didn't feel like they had another choice.

Regarding consideration, at oral argument plaintiff's counsel indicated that the parties agreed upon a price of "[j]ust compensation," adding that "I think that you can have an open end as far as the compensation goes, as long as there's some mechanism for determining what that compensation would be." (alteration added). At the oral argument, plaintiff's counsel continued:

> Well, listen, in honesty, there is a price that my client pays for a product, and then there's a price that it's worth on the open market after he warehouses it and keeps it and waits for somebody to come and need it. And if the Government needs ten antennae, and they can't get it for less than $10 million, say, from the contractor because the contractor has to restart the line or a new contract has to be let, or they can't find it anywhere else, then the value of it becomes something different than what the Government thinks it is. If the Government thinks that they can go back and say, all right, listen, we can save $10 million by not restarting this line and having these products, you know, remanufactured by the original manufacturer, let's get it for -- let's get it from DaVinci for $7,000 or $10,000. And DaVinci doesn't have to sell them at that price, and the just compensation or fair market value of the antennas would be something that's subject to proofs, and it would be something maybe subject to an expert to make a determination as to whether it's $7,000 or it's $10 million or whatever my client was asking for at the time, but that's a range that my client was willing to agree to at the time when the antennas were turned over.

In response to plaintiff's claim that the September 23, 2014 Letter "considering the parties' prior negotiations, was an offer," defendant states "DaVinci argues that there was a unilateral contract, wherein an offer is accepted by performance, leaving only the offeror's obligation to pay. Defendant contends, however,

> DaVinci has not pled a unilateral contract. DaVinci does not allege facts to support the conclusion that DaVinci delivered the JASSM Antennas to the Government in response to the Government's offer to purchase them and promise to pay DaVinci their fair market value. Absent such an offer and promise by the Government to DaVinci, no unilateral contract can exist.

(citation omitted). Defendant further asserts that the government did not purchase the antennas but, instead, "Special Agent Joel Russell, Office of Special Investigations, accompanied by two Air Force Officers, arrived at DaVinci's business location in Van Nuys, CA, and demanded that DaVinci surrender the JASSM Antennas, under compulsion of law

(the Espionage Act), 18 U.S.C. § 793(d)," and that "DaVinci's delivery of items to the Government under compulsion of law, the Espionage Act, 18 U.S.C. § 793(d), is not a voluntary assent to enter into a contract with the Government."

Moreover, defendant argues that "[n]owhere is there any promise on the part of the Government to pay anything, including the JASSM Antennas' fair market value" in the September 23, 2014 Letter. (alteration added). Defendant argues that the language in the September 23, 2014 Letter stating "that DaVinci's delivery 'is made without prejudice to any claims . . . for their fair market value' does not recognize or acknowledge that Mr. Parra or DaVinci has a right or valid claim to the JASSM Antennas' fair market value." (emphasis and omission in original). In fact, defendant contends that the language of the September 23, 2014 Letter that delivery of the antennas to the government was "made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value" was "entirely noncommittal regarding whether Mr. Parra or DaVinci have a right or valid claim for the JASSM Antennas' fair market value." According to defendant, "[t]here are no words of commitment promising the Government shall pay their fair market value. Mr. Parra and DaVinci simply are told that they may make a claim," and ask for fair market value. (alteration added). Therefore, defendant argues that the language of the September 23, 2014 Letter "cannot be read as a promise to pay the fair market value for the ten JASM [sic] Antennas seized, and does not constitute a promise to DaVinci, or consideration." (alteration added; citation omitted).

Defendant also argues that, in addition to the September 23, 2014 Letter not constituting an offer, "there was no acceptance" by plaintiff. Defendant cites the September 23, 2014 Letter to argue that the language of the September 23, 2014 Letter "precluded the delivery of the JASSM Antennae from being reasonably understood as an acceptance [by plaintiff] that would create a binding contract wherein the Government purchased the JASSM Antennas and promised to pay DaVinci their fair market value." (alteration added). Defendant asserts that "Mr. Parra and/or DaVinci's delivery of the JASSM Antennas could not constitute an acceptance, resulting in a binding contract" because:

> The September 23, 2014 Letter, Exhibit F, expressly stated that the Government was taking possession of the JASSM Antennas pursuant to 18 U.S.C. § 793(d), making plain that the JASSM Antennas were being "claimed as constituting or consisting of 'information relating to national defense,'" Exhibit F, and that "the delivery of said items . . . is made under compulsion of law pursuant to 18 USC [sic] 793(d)." Exhibit F. The delivery of items to the Government under compulsion of law cannot constitute an acceptance that would form a binding contract with the Government.

(omission in original; alteration added).

As described above, the September 23, 2014 Letter to plaintiff, signed by Special Agent Christmas, with a concurrence signature from Captain Lewis, stated:

> The undersigned, being fully authorized to take possession of the following identified items being claimed as constituting or consisting of "information relating to the national defense" acknowledges receipt of ten (10) JASSM antennae - from Leonardo Parra and DaVinci Aircraft. The undersigned further acknowledges that the delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793 (d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value.

(alteration added).

As identified above, the required elements to demonstrate an express contract are: "'(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract.'" Boyd v. United States, 134 F.4th at 1352 (quoting Anderson v. United States, 344 F.3d at 1353); see also Fairholme Funds, Inc. v. United States, 26 F.4th at 1293-94; Columbus Reg'l Hosp. v. United States, 990 F.3d at 1339. The September 23, 2014 Letter cannot form the basis of an express contract because the September 23, 2014 Letter does not evidence "mutuality of intent to contract," a "lack of ambiguity in offer and acceptance" or "consideration." See id. Instead, the September 23, 2014 Letter reflects that the government assumed the right to take possession of the antennas and that delivery of the ten antennas by plaintiff was being made under compulsion of 18 U.S.C. § 793(d). As defendant correctly notes, in the September 23, 2014 Letter, "[n]owhere is there any promise on the part of the Government to pay anything, including the JASSM Antennas' fair market value," whatever that might be, or any specific amount for payment by defendant. (alteration added). The September 23, 2014 Letter only states that the delivery to the government is being "made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value" that the plaintiff might later choose to pursue. Therefore, the September 23, 2014 Letter does not reflect any agreement to enter into a contract between the plaintiff and the government, or a promise by the government to pay plaintiff.

Additionally, the communication between plaintiff and the government in advance of the government taking possession of the antennas on September 30, 2014 demonstrates that there was no agreement on the price to be paid for the antennas and further shows how far apart the parties were on any potential sale. As reflected above, on June 2, 2014, Captain Lewis emailed plaintiff's Sales Department, stating:

> The government would like to extend an offer of $7,359 for the purchase of the 10 JASSM GPS Antennas. This is based on the price originally paid for the purchase of the lot of military equipment from DCMA. We're looking forward to hearing from you.

Two days later, on June 4, 2014, Mr. Niemans replied to Captain Lewis by email, stating that:

> We sent an email a few days ago responding to your offer. $75,000.00 each is the best price we are going to be able to go on these antennas; that is the price after giving the USAF a 40% discount off the price we were originally quoting these units out at. $7,359.00 for the lot of 10 antennas is just far too low to consider.

Also on June 4, 2014, Captain Lewis sent a reply:

> I'm sure you understand that the government must determine the prices it pays for parts to be fair and reasonable as the taxpayer depends on us to be good stewards of their dollars. Seeing that these units only cost a fraction of that amount brand new, the government is unwilling and unable to accept that price. I encourage you to propose a more reasonable price so we both can benefit.

> Plaintiff's "Second Amended Complaint" alleges:

> On or about June 11, 2014, DaVinci received a telephone call from Capt. Rodney Lewis, Department of the Air Force. Capt. Lewis stated that the Air Force was in "urgent need" of the JASSM Antennae and asked DaVinci for a price quotation. DaVinci responded with a verbal price quotation of $125,000 each, for the 10 JASSM Antennae owned by DaVinci. Capt. Lewis replied that the price quoted by DaVinci was too high, and that the Antennae were not worth that amount of money as they were "no good."

Plaintiff also alleges on June 11, 2014:

> Capt. Lewis sent an email to DaVinci requesting a written price quotation for the 10 JASSM Antennae. 29. [sic] On June 11, 2014, in response to Capt. Lewis' email request, DaVinci prepared and sent a written Quotation to Eglin AFB [Air Force Base], listing the full purchase price for the 10 JASSM Antennae at $125,000,000, [sic] and offering a 52% discount for a final price of $600,000.

(alterations added). Plaintiff's "Second Amended Complaint" concedes that plaintiff "received no response to the written Quotation dated June 11, 2014." As identified in the plaintiff's "Second Amended Complaint," on June 12, 2014, Brandi Clark sent another email to Mr. Niemans, copying Captain Lewis, stating: "I did not receive the revised offer that we talked about on the phone yesterday. Please forward a copy to Capt Lewis and myself at your earliest convenience." Four days later, on June 16, 2014, Captain Lewis sent the following email to Mr. Niemans and Brandi Clark:

> Brandi [Clark] has been working this purchase for me and is out of the office for the next two weeks. I just wanted to touch base and make sure the quote is not lost in the webisphere. We have not received an updated quote from you. Please include me on the email since Brandi is out of the office.

(alteration added). The nature of the communications between the plaintiff and the government reflects an ongoing dialogue between the parties and does not demonstrate any agreement was reached, or that a meeting of the minds had occurred in June of 2014. Further, as of June 2014, none of the contract requirements of mutuality of intent to contract, a lack of ambiguity in offer and acceptance or and consideration were met. See Boyd v. United States, 134 F.4th at 1352. The next action to occur, according to plaintiff's "Second Amended Complaint," was defendant taking possession of the antennas on September 30, 2014. In sum, the parties had not agreed on compensation for a possible sale of the antennas and, further, the parties had not come to any contractual agreement on a sale of the antennas before the antennas were reclaimed by the defendant.

As for plaintiff's argument that the September 23, 2014 Letter resulted in a unilateral contract, plaintiff's allegations do not demonstrate that a unilateral contract was entered into by the government and plaintiff. As explained by the United States Court of Appeals for the Federal Circuit in Wells Fargo Bank, N.A. v. United States, "the essence of a unilateral contract is that one party's promise is conditional upon the other party's performance of certain acts and when the other party performs, the first party is bound." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1019 (Fed. Cir. 1996); see also C & L Grp., LLC v. United States, 140 Fed. Cl. 750, 756 (2018) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d at 1019); Frankel v. United States, 118 Fed. Cl. at 335. As determined above, there was no promise made by the defendant to pay plaintiff for the antennas, and, therefore, there were no acts that plaintiff could have performed to bind the government to that promise. The September 23, 2014 Letter demonstrates that the government believed it had the right and obligation to take possession of the antennas from the plaintiff. The plaintiff's own statements also demonstrate it is not clear what acts the plaintiff performed that allegedly bound the government because, as reflected above, plaintiff indicated DaVinci both voluntarily surrendered the antennas and was forced to give over the antennas to the defendant under duress. The September 23, 2014 Letter does not form the basis of a bilateral express contract or a unilateral express contract between plaintiff and the government.

Moreover, regarding plaintiff's claim that an implied-in-fact contract came into existence, plaintiff argues:

> With respect to an implied contract, the parties' mutual assent is even more evident. Contracting Officer Rodney Lewis unequivocally stated that he had been assigned the task of purchasing the JASSM Antennas from Plaintiff, and he never made any statement to the contrary. The parties' consummation of that purchase was subject only to price negotiations which, upon receipt of the September 24, 2014 [sic] letter, appeared to have been satisfactorily resolved – even though Plaintiff would have to deliver the goods prior to receiving payment. The parties entered into a valid and enforceable contract as evidenced by the parties' negotiations, the September 23, 2014 letter which was signed by Contracting Officer Rodney Lewis, and by Plaintiff's subsequent performance.

(alteration added; internal citation omitted). Defendant responds that

> Capt. Lewis' statement in his June 4, 2014 email that he had been "assigned the purchase" of the JASSM Antennas must be read in context and does not constitute an implied contract. The allegations and exhibits to DaVinci's complaint demonstrate that Capt. Lewis never made an agreement with DaVinci to purchase the JASSM Antennas. On April 21, 2014, DaVinci provided to Eglin AFB a Quotation for sale of ten JASSM Antennas in the amount of $75,000 each, for a total of $750,000. A Quotation is not an offer.

(internal citation omitted). The court notes that being assigned to purchase items and consummating a deal are, by their very nature, two completely different things. Defendant also argues that the September 23, 2014 Letter "did not contain any promissory words or commitment to pay the JASSM Antennas' fair market value," no agreement was ever reached, and the September 23, 2014 Letter only suggested that the September 23, 2014 Letter "left Mr. Parra and DaVinci with only the option of submitting a claim, with no recognition on the Government's part that such a claim carried any merit."

As noted above, the requirements to form a contract with the government apply equally to both express and implied-in-fact contracts. See Boyd v. United States, 134 F.4th at 1352; see also Night Vision Corp. v. United States, 469 F.3d at 1375; Hanlin v. United States, 316 F.3d at 1328; City of Cincinnati v. United States, 153 F.3d at 1377. As with plaintiff's allegations for the formation of an express contract, plaintiff is unable to demonstrate how an implied-in-fact contract was formed under the facts of this case. Simply because Captain Lewis was "assigned the purchase" of the antennas does not demonstrate that there was "mutuality of intent to contract," "lack of ambiguity in offer and acceptance," or "consideration" to form a contract. See Anderson v. United States, 344 F.3d at 1353; see also Total Med. Mgmt., Inc. v. United States, 104 F.3d at 1319; City of Cincinnati v. United States, 153 F.3d at 1377. Neither does Captain Lewis' statement that he was "assigned the purchase" of the antennas reflect a clear statement of offer and acceptance to form an implied-in-fact contract to purchase the antennas. Additionally, there was not a clear agreement on a purchase price, as plaintiff's own argument demonstrates when plaintiff stated: "The parties' consummation of that purchase was subject only to price negotiations which, upon receipt of the September 24, 2014 [sic] letter, appeared to have been satisfactorily resolved – even though Plaintiff would have to deliver the goods prior to receiving payment." (alteration added). It is evident that the June 4, 2014 email from Captain Lewis, alone, or in conjunction with the September 23, 2014 Letter, does not demonstrate an implied-in-fact contract was formed between plaintiff and the government for the purchase of the antennas.

Additionally, defendant argues that even if the September 23, 2014 Letter could be construed as an offer, which it cannot, "Mr. Parra and/or DaVinci's delivery of the JASSM Antennas could not constitute an acceptance, resulting in a binding contract," because an "involuntary action cannot constitute either the consent or the consideration required to form an implied-in-fact contract." Defendant took possession of the antennas on

September 30, 2014, "under compulsion of law," because the government claimed the antennas were "information relating to the national defense." As described above, the September 23, 2014 Letter provided:

> The undersigned, being fully authorized to take possession of the following identified items being claimed as constituting or consisting of "information relating to the national defense" acknowledges receipt of ten (10) JASSM antennae - from Leonardo Parra and DaVinci Aircraft. The undersigned further acknowledges that the delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793 (d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value.

(alteration added). Plaintiff was not given a choice to keep the antennas, but was ordered to provide them to the government. See Kam-Almaz v. United States, 682 F.3d at 1369 ("The complaint further fails to allege facts indicating the mutual intent required for an implied-in-fact contract. A seizure, essentially by definition, lacks mutual intent."). Although the plaintiff made contradictory statements about whether plaintiff was forced to turn over the antennas, at oral argument plaintiff's counsel of record stated that the antennas

> were turned over under compulsion, and there were some potential threats of criminal, you know, charges or whatever if they didn't do what they were being asked to do, so there was some duress there, but, still, they do go ahead and accept that agreement. I mean, they had no other choice really. They didn't feel like they had another choice.

Despite plaintiff's allegation that an implied-in-fact contract came into existence with the government in the case now under review, seizure pursuant to the Air Force's authority does not give rise to an implied-in-fact contract. See Kam-Almaz v. United States, 682 F.3d at 1369 ("because Kam–Almaz did not voluntarily deliver his property to the government, his complaint fails to allege any valid consideration") (citing Llamera v. United States, 15 Cl. Ct. 593, 597 (1988)). In sum, plaintiff's "Second Amended Complaint" does not allege sufficient facts to demonstrate either an express contract or an implied-in-fact contract was entered into between plaintiff and the government.

Separate from plaintiff's contract claims, Count III of plaintiff's "Second Amended Complaint" alleges a "TAKINGS CLAIM UNDER [the] FIFTH AMENDMENT" to the United States Constitution. (capitalization in original; alteration added). Defendant's motion to dismiss argues that "[t]he Court does not possess jurisdiction over DaVinci's Taking Claim," arguing that the plaintiff did not raise a takings claim within the court's applicable six year statute of limitations. (alteration added). Defendant also argues that "[b]ecause the Government seized the ten JASSM Antenna [sic] pursuant to the Espionage Act, and they were classified at the time they were seized, there was no taking of private property for which just compensation is due." (alterations added; citation omitted).

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 31 (2012) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. at 49), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005)); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123–24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. at 536; Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. 166, 179 (1871) (citing principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified"); Reoforce, Inc. v. United States, 853 F.3d 1249, 1265 (Fed. Cir.), cert. denied, 583 U.S. 1014 (2017); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir. 2009), cert. denied, 559 U.S. 935 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998). While the Supreme Court of the United States has "drawn some bright lines" regarding whether a government action constitutes a taking, the Supreme Court recognizes "that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." Ark. Game & Fish Comm'n v. United States, 568 U.S. at 31. Thus, "most takings claims turn on situation-specific factual inquiries." Id. at 32; see also Barlow v. United States, 86 F.4th 1347, 1353 (Fed. Cir. 2023) ("'Whether a taking has occurred is a question of law based on factual underpinnings.'" (quoting Chi. Coating Co., LLC v. United States, 892 F.3d 1164, 1169 (Fed. Cir. 2018)).

To succeed under the Fifth Amendment Takings Clause, a plaintiff has the burden of proof to demonstrate that the government took a private property interest for public use without just compensation. See City of Fresno v. United States, 124 F.4th 876, 895 (Fed. Cir. 2024) ("First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest . . . ." (omission added)); St. Bernard Par. Gov't v. United States, 887 F.3d 1354, 1362 (Fed. Cir. 2018) ("It is well established that a takings plaintiff bears the burden of proof to establish that the government action caused the injury."), cert. denied, 586 U.S. 1069 (2019); Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the "classic taking [is one] in which the government directly appropriates private property for its own use" (alteration in Dimare Fresh, Inc. v. United States) (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 324 (2002))), cert. denied, 579 U.S. 902 (2016); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d at 1385.

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Casitas Mun. Water Dist. v. United States, 708 F.3d

1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); see also McCutchen v. United States, 14 F.4th 1355, 1364 (Fed. Cir. 2021) (quoting Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008)), cert. denied, 143 S. Ct. 422 (2022); Welty v. United States, 926 F.3d 1319, 1323-24 (Fed. Cir. 2019) ("To maintain a cognizable claim for a Fifth Amendment taking, a plaintiff must establish that he possessed an enforceable property right that was taken by the government for public purposes without just compensation." (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014–19, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372 ("'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied sub nom. E. Mins. Int'l, Inc., et. al v. United States, 535 U.S. 1077 (2002); and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir.), reh'g denied, (Fed. Cir. 1992))); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (stating that the court does not address the second step "without first identifying a cognizable property interest" (citing Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1381; and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003))), reh'g and reh'g en banc denied (Fed. Cir. 2005); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end." Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003); and M & J Coal Co. v. United States, 47 F.3d at 1154); see also Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1329 (Fed. Cir. 2012) (citing Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372), cert. denied, 567 U.S. 917 (2012). In addition to "'having identified a valid property interest, the court must determine whether the government action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

Defendant's motion to dismiss argues that plaintiff's takings claim should be dismissed for "the Court's failure to possess jurisdiction of Count III, because of the statute of limitations," noting that claims "against the Government under the Tucker Act are subject to a six-year statute of limitations." Defendant argues that "DaVinci's alleged takings claim accrued on September 30, 2014, when the ten JASSM Antennae were seized, and any takings claim had to be filed within six years of that date. Consequently, Count III, DaVinci's takings claim filed in 2022, is barred by the statute of limitations."

This court's jurisdiction is expressly limited in this case by 28 U.S.C. § 2501 (2024), which prescribes a six-year statute of limitations for filing claims arising under the Tucker Act's waiver of sovereign immunity. According to 28 U.S.C. § 2501: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Id. "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008); see also Ideker Farms, Inc. v. United States, 71 F.4th 964, 974-75 (Fed. Cir. 2023); Jones v. United States, 30 F.4th 1094, 1100 (Fed. Cir. 2022) ("To fall within the jurisdiction of the Court of Federal Claims, a claim against the United States filed in that court must be 'filed within six years after such claim first accrues.'" (quoting 28 U.S.C. § 2501, and citing John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 132-35 (2008))), cert. denied, 143 S. Ct. 566 (2023); Katzin v. United States, 908 F.3d 1350, 1358 (Fed. Cir. 2018) ("The Tucker Act statute of limitations is jurisdictional; we must therefore determine whether Plaintiffs' claims are timely before proceeding to the merits of the takings claim." (citing John R. Sand & Gravel Co. v. United States, 552 U.S. at 136)); Nix v. United States, 174 Fed. Cl. 260, 266 (2024); Roseberry-Andrews v. United States, 144 Fed. Cl. 29, 33 (2019); Schnell v. United States, 115 Fed. Cl. 102, 104-5 (2014). The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues ""when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."" Samish Indian Nation v. United States, 419 F.3d at 1369 (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004)); see also Ideker Farms, Inc. v. United States, 71 F.4th at 975 ("A claim accrues 'when all the events have occurred which fix the liability of the Government' and the plaintiff 'was or should have been aware' that the claim existed." (quoting Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)))); Jones v. United States, 30 F.4th at 1100 ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue . . . for [the plaintiff's] money.'" (alteration and ellipsis in original) (quoting Martinez v. United States, 333 F.3d at 1303 (quoting Nager Elec. Co. v. United States, 177 Ct. Cl. 234, 239, 368 F.2d 847, 851 (1966), motion denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)))); FloorPro, Inc. v. United States, 680 F.3d 1377, 1381 (Fed. Cir. 2012); Martinez v. United States, 333 F.3d at 1303 ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" (quoting Nager Elec. Co. v. United States, 177 Ct. Cl. at 240); Mildenberger v. United States, 643 F.3d 938, 944–45 (Fed. Cir. 2011); Hopland Band of Pomo Indians v. United States, 855 F.2d at 1577; see also Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. at 481; Brizuela v. United States, 103 Fed. Cl. 635, 639, aff'd, 492 F. App'x 97 (Fed. Cir. 2012), cert. denied, 568 U.S. 1251 (2013).

As summarized by the United States Court of Appeals for the Federal Circuit in Holmes v. United States:

> Section 2501 states that all claims that otherwise fall within the jurisdiction of the Court of Federal Claims "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A cause of action first accrues when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action.

Holmes v. United States, 657 F.3d 1303, 1317 (Fed. Cir. 2011) (citing Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009)) (alteration in original); see also Etchegoinberry v. United States, 132 F.4th 1374, 1379 (Fed. Cir. 2025); White v. United States, 175 Fed. Cl. 226, 232 (2025); Parkwood Assocs. Ltd. P'ship v. United States, 97 Fed. Cl. 809, 813-14 (2011) ("Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely." (citing Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998))), aff'd, 465 F. App'x 952 (Fed. Cir. 2012).

As the Federal Circuit explained in John R. Sand & Gravel Co., with respect to the accrual of a takings claim under the Fifth Amendment:

> A takings claim accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" Goodrich, 434 F.3d at 1333 (quoting Hopland, 855 F.2d at 1577); see also Bowen v. United States, 292 F.3d 1383, 1385 (Fed. Cir. 2002). In addition, the claim only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability. Goodrich, 434 F.3d at 1333; Hopland, 855 F.2d at 1577; Kinsey v. United States, 852 F.2d 556, 557 n. *[11] (Fed. Cir. 1988).

John R. Sand & Gravel Co. v. United States, 457 F.3d at 1355-56 (alterations and footnote added). The Federal Circuit further clarified when a takings claim accrues in Katzin v. United States:

> A physical takings claim accrues when the scope of what is taken is fixed, see Samish Indian Nation v. United States, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc)) (stating that a claim under § 2501 accrues "when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money"), and the plaintiff knew or should have known of the acts that fixed the government's alleged liability, Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988).

---

[11] The single footnote in Kinsey v. United States is not identified by a number, but by an asterisk as correctly represented in John R. Sand & Gravel Co. v. United States.

Katzin v. United States, 908 F.3d at 1358. Moreover, the Federal Circuit also elaborated on the standard for the accrual of a takings claim in Petro-Hunt, L.L.C. v. United States:

> A claim under the Fifth Amendment accrues when the taking action occurs. Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994) (citing Steel Improvement & Forge Co. v. United States, 355 F.2d 627, 631 (Ct. Cl. 1966)). Generally, such a taking occurs when the government deprives an owner of the use of his or her property. See United States v. Causby, 328 U.S. 256, 261–62, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946). A permanent takings claim arises when (1) all the events which fix the government's liability have occurred; and (2) the plaintiff knew or should have known about the existence of these events. See Japanese War Notes Claimants Ass'n v. United States, 373 F.2d 356, 358–59 (Ct. Cl.), cert. denied, 389 U.S. 971, 88 S. Ct. 466, 19 L. Ed. 2d 461 (1967).

Petro-Hunt, L.L.C. v. United States, 862 F.3d 1370, 1378 (Fed. Cir. 2017), cert. denied, 138 S. Ct. 1989 (2018); see also Nw. La. Fish & Game Pres. Comm'n v. United States, 446 F.3d 1285, 1289 (Fed. Cir. 2006) ("A taking occurs when governmental action deprives the owner of all or most of its property interest." (citing United States v. Gen. Motors Corp., 323 U.S. at 378)); Patkin Constr. Co. v. United States, 153 Fed. Cl. 513, 532 (2021) ("A Fifth Amendment taking generally occurs when the government deprives an owner of the use and enjoyment of his or her property." (citing United States v. Causby, 328 U.S. at 261-62)).

Accrual of a claim is "'determined under an objective standard'" and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996)). Plaintiff does not need to be aware of all relevant facts for a cause of action to accrue, the statute of limitations begins running once they are aware of sufficient facts to know that they have been wronged. See Osborn v. United States, 47 Fed. Cl. 224, 233 (2000). Moreover, "for purposes of determining when the statute of limitations begins to run, the 'proper focus' must be 'upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts [become] most painful.'" Navajo Nation v. United States, 631 F.3d 1268, 1277 (Fed. Cir. 2011) (emphasis and alterations in original) (quoting Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980)). The Federal Circuit in Holmes v. United States offered further explanation, writing,

> the "accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." Id. [Holmes v. United States, 92 Fed. Cl. 311,] 319 [(2010)] (quoting Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008)). For the accrual suspension rule to apply, the plaintiff "must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at

the accrual date." <u>Young</u>, 529 F.3d at 1384 (quoting <u>Martinez v. United States</u>, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)).

<u>Holmes v. United States</u>, 657 F.3d at 1317 (alterations added; footnotes omitted).

In response to defendant's argument that plaintiff's takings claim was only included in plaintiff's "Second Amended Complaint" filed on December 5, 2022 in this court, and, therefore, is filed outside the applicable statute of limitations time, DaVinci argues "[p]laintiff's amendment to add a takings claim relates back to the original complaint's filing for statute of limitations purposes" in the United States District Court for the Central District of California. (alteration added). Defendant argues that "DaVinci's alleged takings claim accrued on September 30, 2014, when the ten JASSM Antennae were seized, and any takings claim had to be filed within six years of that date. Consequently, Count III, DaVinci's takings claim filed in 2022, is barred by the statute of limitations." Defendant argues that plaintiff's "Second Amended Complaint" does not "relate back" to the original complaint, filed by the plaintiff in the United States District Court for the Central District of California on August 5, 2016, or plaintiff's amended complaint filed in the United States District Court on February 21, 2017, because "DaVinci's original and amended district court complaints both did not assert a takings claim." (alterations added).

In this court, RCFC 15(c) states, in pertinent part:

**(c) Relation Back of Amendments.**

**(1)** <u>**When an Amendment Relates Back.**</u> An amendment to a pleading relates back to the date of the original pleading when:

**(A)** the law that provides the applicable statute of limitations allows relation back;

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.

RCFC 15(c)(1) (2024) (emphasis in original). As indicated by the United States Court of Appeals for the Federal Circuit, if a complaint "relates back," that will "overcome the government's challenge based upon the six-year statute of limitations." <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1370 (Fed. Cir. 2004) (referencing RCFC 15(c)); <u>see</u> <u>also</u> <u>Dinh v. United States</u>, 166 Fed. Cl. 513, 528 (2023) (citing <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d at 1370).

Regarding defendant's argument that the plaintiff's August 5, 2016 original complaint, and February 21, 2017 amended complaint, both filed in the United States District Court for the Central District of California, did not include a takings claim before transfer to this court, so that the takings claim, now included in this court after the case was transferred from the District Court, defendant argues

the takings claim in Count III of the Second Amended Complaint (Dkt 73) arises from additional alleged facts that are not in DaVinci's two complaints filed in district court. Dkt 1 (original complaint); Dkt 19 (amended complaint filed February 21, 2017). Specifically, DaVinci makes the following additional allegations not included in its district court complaints: "Upon information and belief, similar replacement JASSM Antennae were available from the original manufacturer for many times the price asked by DaVinci," and "Upon information and belief, the Defendant is using, or used, the JASSM Antennae for a public use." Compl. ¶¶48, 50. Accordingly, Count III does not relate back to DaVinci's district court complaints.

Plaintiff argues, however, that "Plaintiff's takings claim arises out of the same exact factual circumstances as its previous complaints. The only additional allegations are either legal conclusions or legal elements of the newly asserted claim."

As noted by another Judge of the United States Court of Federal Claims,

the inquiry is whether "the operative facts in the original complaint . . . put the government on notice." Santana on behalf of Santana v. United States, 155 Fed. Cl. 57, 69 (2021); see also Fauvergue v. United States, 85 Fed. Cl. 50, 54 (2008) (noting the relevant inquiry focuses on the notice given to the defendant by the factual assertions set forth in the original pleading). This notice-based understanding of RCFC 15 asks a court to determine "whether the general factual situation or the aggregate of operative facts underlying the original claim for relief gave notice to [the defendant] of the nature of the allegations it was being called upon to answer."

Schell & Kampeter, Inc. v. United States, 159 Fed. Cl. 829, 833 (2022) (quoting Anza Tech., Inc. v. Mushkin, Inc., 934 F.3d 1359, 1369-70 (Fed. Cir. 2019)) (alteration and omission in original).

Plaintiff's original complaint, filed on August 5, 2016 in the United States District Court for the Central District of California, alleged:

13. Plaintiff is informed, believes and thereupon alleges that on or about March 2013, Lockheed Martin, at the request of Kay Kooler, PLCO, Air Force Defense Contract Management Agency, offered for sale ten (10) JASSM GPS antennae originally manufactured by Ball Aerospace.

14. Plaintiff is informed, believes and thereupon alleges that the 10 JASSM GPS antennae (hereinafter collectively referred to as the "JASSM Antennae") did not require demilitarization and were authorized for public sale, excluding export.

15. Plaintiff is informed, believes and thereupon alleges that on or about March 2013, the 10 JASSM Antennae were purchased by Avatar Unlimited from Lockheed Martin as part of a bulk sale of surplus parts.

16. Plaintiff is informed, believes and thereupon alleges that on or about June 2013, Avatar Unlimited sold the 10 JASSM Antennae to BPB Surplus for a sum of $3,500.

17. On or about August 1, 2013, Plaintiff DaVinci purchased the 10 JASSM Antennae from BPB Surplus for the sum of $3,000. A true and correct copy of the purchase invoice from BPB Surplus to DaVinci is attached hereto as **Exhibit "A"**, and incorporated herein by reference.

18. From approximately August 2013, Plaintiff DaVinci advertised the 10 JASSM Antennae for sale on the surplus parts market at an asking price of approximately $125,000 for each of the Antennae. Plaintiff DaVinci advertised the 10 JASSM Antennae for sale on the surplus parts market using parts listing services, including NSN-Now and ILSmart. Examples of listings by DaVinci advertising for sale the JASSM Antennae on NSN-Now and ILSmart parts listing services are attached hereto, marked collectively as **Exhibit "B"**, and incorporated herein by reference.

19. On September 17, 2013, at approximately 11:30 hours, Special Agent In Charge Laura Voyatzis, U.S. Air Force Office of Special Investigations, accompanied by Special Agents Lenora Madison, John Drapalik, and David Givernero, arrived at DaVinci's business office located in Van Nuys, California. Special Agent Voyatzis stated that their purpose was to inspect and discuss the 10 JASSM Antennae in DaVinci's possession.

20. After inspecting the JASSM Antennae, Special Agent in Charge Voyatzis demanded that DaVinci surrender all ten JASSM Antennae, without any legal warrant, court order, or paperwork of any kind.

. . .

27. On or about June 11, 2014, DaVinci received a telephone call from Capt. Rodney Lewis, Department of the Air Force. Capt. Lewis stated that the Air Force was in "urgent need" of the JASSM Antennae and asked DaVinci for a price quotation. DaVinci responded with a verbal price quotation of $125,000 each, for the 10 JASSM Antennae owned by DaVinci. Capt. Lewis replied that the price quoted by DaVinci was too high, and that the Antennae were not worth that amount of money as they were "no good."

28. Thereafter, also on June 11, 2014, Capt. Lewis sent an email to DaVinci requesting a written price quotation for the 10 JASSM Antennae.

35

29. On June 11, 2014, in response to Capt. Lewis' email request, DaVinci prepared and sent a written Quotation to Eglin AFB, listing the full purchase price for the 10 JASSM Antennae at $125,000,000, and offering a 52% discount for a final price of $600,000. A true and correct copy of the Quotation dated June 11, 2014 is attached hereto as **Exhibit "E"** and incorporated herein by this reference.

30. DaVinci received no response to the written Quotation dated June 11, 2014.

31. On September 30, 2014, at approximately 09:15 hours, Special Agent Joel S. Russell, Office of Special Investigations, accompanied by two Air Force Officers, arrived at DaVinci's business location in Van Nuys, California, and demanded that DaVinci surrender the 10 JASSM Antennae, under compulsion of law. Special Agent Russell stated that the Air Force was authorized to and intended to take possession of 10 JASSM GPS Antennae.

32. On September 30, 2014, at the same time and place, Special Agent Russell presented DaVinci with a letter signed by Dept. of the Air Force, Office of Special Investigations, Special Agent in Charge, Michael Christmas, SA, DAFC, dated 23 Sept. 2014, purportedly authorizing the Air Force to take possession of the JASSM antennae. The letter specifically acknowledges that "delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793(d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value." A true and correct copy of Special Agent Christmas' letter is attached hereto as **Exhibit "F"**, and incorporated herein by reference.

33. On September 30, 2014, pursuant to the demands and threats made by Special Agent Russell to provide the JASSM Antennae under compulsion of law pursuant to 18 USC [sic] 793 (d), including the threat of criminal prosecution for any failure to comply, Plaintiff DaVinci surrendered the 10 JASSM Antennae to Special Agent Russell. Agent Russell signed a written acknowledgment of his receipt of the 10 JASSM Antennae seized. A true and correct copy of the "Receipt For Items Taken Under Compulsion" is attached hereto as **Exhibit "G"** and incorporated herein by reference.

34. On or about September 30, 2014, Plaintiff DaVinci delivered to Special Agent Russell an Invoice for the seized JASSM Antennae in the amount of $1,250,000, the full originally quoted contract price, without discount. A true and correct copy of the Invoice is attached hereto as **Exhibit "H"**, and incorporated herein by reference.

(emphasis in original; alterations and omission added).

By way of comparison, although in a more abbreviated fashion and with different paragraph numbers, plaintiff's "Second Amended Complaint" filed in this court on December 5, 2022, tracks the allegations in plaintiff's original complaint filed in the United States District Court for the Central District of California on August 5, 2016 and alleges:

9. On or about March 2013, the 10 JASSM Antennae were purchased by Avatar Unlimited from Lockheed Martin as part of a bulk sale of surplus parts. [more fully alleged at paragraph 13 in plaintiff's original complaint]

10. On or about June 2013, Avatar Unlimited sold the 10 JASSM Antennae to BPB Surplus for a sum of $3,500. [same allegation at paragraph 16 in plaintiff's original complaint]

11. On or about August 1, 2013, Plaintiff DaVinci purchased the 10 JASSM Antennae from BPB Surplus for the sum of $3,000. A true and correct copy of the purchase invoice from BPB Surplus to DaVinci is attached hereto as Exhibit "A", and incorporated herein by reference. [same allegation at paragraph 17 in plaintiff's original complaint]

12. From approximately August 2013, Plaintiff DaVinci advertised the 10 JASSM Antennae for sale on the surplus parts market at an asking price of approximately $125,000 for each of the Antennae. Plaintiff DaVinci advertised the 10 JASSM Antennae for sale on the surplus parts market using parts listing services, including NSN-Now and ILSmart. Examples of listings by DaVinci advertising for sale the JASSM Antennae on NSN-Now and ILSmart parts listing services are attached hereto, marked collectively as Exhibit "B", and incorporated herein by reference. [same allegation at paragraph 18 in plaintiff's original complaint]

13. On September 17, 2013, at approximately 11:30 hours, Special Agent In Charge Laura Voyatzis, U.S. Air Force Office of Special Investigations, accompanied by Special Agents Lenora Madison, John Drapalik, and David Givernero, arrived at DaVinci's business office located in Van Nuys, California. Special Agent Voyatzis stated that their purpose was to inspect and discuss the 10 JASSM Antennae in DaVinci's possession. [same allegation at paragraph 19 in plaintiff's original complaint]

14. After inspecting the JASSM Antennae, Special Agent in Charge Voyatzis demanded that DaVinci surrender all ten JASSM Antennae, without any legal warrant, court order, or paperwork of any kind. [same allegation at paragraph 20 in plaintiff's original complaint]

. . .

21. On or about June 11, 2014, DaVinci received a telephone call from Capt. Rodney Lewis, Department of the Air Force. Capt. Lewis stated that the Air

Force was in "urgent need" of the JASSM Antennae and asked DaVinci for a price quotation. DaVinci responded with a verbal price quotation of $125,000 each, for the 10 JASSM Antennae owned by DaVinci. Capt. Lewis replied that the price quoted by DaVinci was too high, and that the Antennae were not worth that amount of money as they were "no good." [same allegation at paragraph 27 in plaintiff's original complaint]

22. Thereafter, also on June 11, 2014, Capt. Lewis sent an email to DaVinci requesting a written price quotation for the 10 JASSM Antennae. 29. [sic] On June 11, 2014, in response to Capt. Lewis' email request, DaVinci prepared and sent a written Quotation to Eglin AFB, listing the full purchase price for the 10 JASSM Antennae at $125,000,000, and offering a 52% discount for a final price of $600,000. A true and correct copy of the Quotation dated June 11, 2014 is attached hereto as Exhibit "E" and incorporated herein by this reference. [combining the same allegations at paragraph 28 and paragraph 29 in plaintiff's original complaint, including paragraph number 29]

23. DaVinci received no response to the written Quotation dated June 11, 2014. [same allegation at paragraph 30 in plaintiff's original complaint]

24. On September 30, 2014, at approximately 09:15 hours, Special Agent Joel S. Russell, Office of Special Investigations, accompanied by two Air Force Officers, arrived at DaVinci's business location in Van Nuys, California, and demanded that DaVinci surrender the 10 JASSM Antennae, under compulsion of law. Special Agent Russell stated that the Air Force was authorized to and intended to take possession of 10 JASSM GPS Antennae. [same allegation at paragraph 31 in plaintiff's original complaint]

25. On September 30, 2014, at the same time and place, Special Agent Russell presented DaVinci with a letter signed by Dept. of the Air Force, Office of Special Investigations, Special Agent in Charge, Michael Christmas, SA, DAFC, dated 23 Sept. 2014, purportedly authorizing the Air Force to take possession of the JASSM antennae. The letter specifically acknowledges that "delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793(d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value." A true and correct copy of Special Agent Christmas' letter is attached hereto as Exhibit "F", and incorporated herein by reference. [same allegation at paragraph 32 in plaintiff's original complaint]

26. On September 30, 2014, pursuant to the demands and threats made by Special Agent Russell to provide the JASSM Antennae under compulsion of law pursuant to 18 USC [sic] 793 (d), including the threat of criminal prosecution for any failure to comply, Plaintiff DaVinci surrendered the 10 JASSM Antennae to Special Agent Russell. Agent Russell signed a written

acknowledgment of his receipt of the 10 JASSM Antennae seized. A true and correct copy of the "Receipt For Items Taken Under Compulsion" is attached hereto as Exhibit "G" and incorporated herein by reference. [same allegation at paragraph 33 in plaintiff's original complaint]

27. On or about September 30, 2014, Plaintiff DaVinci delivered to Special Agent Russell an Invoice for the seized JASSM Antennae in the amount of $1,250,000, the full originally quoted contract price, without discount. A true and correct copy of the Invoice is attached hereto as Exhibit "H", and incorporated herein by reference. [same allegation at paragraph 34 in plaintiff's original complaint]

(alterations and omission added).

The factual allegations included in plaintiff's original complaint, filed in the United States District Court on August 5, 2016, are essentially the same pertinent allegations about DaVinci's alleged possession of the antennas and the occurrences thereafter leading to defendant's seizure of the antennas that plaintiff asserts in its "Second Amended Complaint," filed in this court on December 5, 2022. Plaintiff's claims asserted in the "Second Amended Complaint" filed in this court arose out of the same "conduct, transaction, or occurrence" set out in the original pleading that was filed in the District Court, see RCFC 15(c), before the case was transferred to United States Court of Federal Claims. Moreover, the similarity of the operative facts from plaintiff's original complaint to the operative facts in the "Second Amended Complaint" put defendant on notice of a claim in the nature of takings allegations. See Schell & Kampeter, Inc. v. United States, 159 Fed. Cl. at 833 (citing Santana on behalf of Santana v. United States, 155 Fed. Cl. at 69). For example, both the original complaint filed on August 5, 2016, and the "Second Amended Complaint" filed on December 5, 2022 allege:

On September 30, 2014, at approximately 09:15 hours, Special Agent Joel S. Russell, Office of Special Investigations, accompanied by two Air Force Officers, arrived at DaVinci's business location in Van Nuys, California, and demanded that DaVinci surrender the 10 JASSM Antennae, under compulsion of law. Special Agent Russell stated that the Air Force was authorized to and intended to take possession of 10 JASSM GPS Antennae.

. . .

On September 30, 2014, at the same time and place, Special Agent Russell presented DaVinci with a letter signed by Dept. of the Air Force, Office of Special Investigations, Special Agent in Charge, Michael Christmas, SA, DAFC, dated 23 Sept. 2014, purportedly authorizing the Air Force to take possession of the JASSM antennae. The letter specifically acknowledges that "delivery of the said items by Leonardo Parra and DaVinci Aircraft is made under compulsion of law pursuant to 18 USC [sic] 793(d) and is made without prejudice to any claims by Leonardo Parra and/or DaVinci Aircraft for their fair market value."

. . .

> On September 30, 2014, pursuant to the demands and threats made by Special Agent Russell to provide the JASSM Antennae under compulsion of law pursuant to 18 USC [sic] 793 (d), including the threat of criminal prosecution for any failure to comply, Plaintiff DaVinci surrendered the 10 JASSM Antennae to Special Agent Russell. Agent Russell signed a written acknowledgment of his receipt of the 10 JASSM Antennae seized.

(alterations and omissions added). Therefore, plaintiff's takings claim, as alleged in its "Second Amended Complaint" in this court, relates back to August 5, 2016, the date plaintiff filed its original complaint in the United States District Court for the Central District of California, and, thus, plaintiff's takings claim, as alleged in the "Second Amended Complaint," is not barred by the Tucker Act's six-year statute of limitations, as August 5, 2016, is within six years of the alleged taking on September 30, 2014.

Separately, defendant argues that "[t]he claimant does not have a cognizable Fifth Amendment property interest in items that it is illegal to possess." (alteration added; citation omitted). Defendant argues that the antennas were classified when "the Air Force Special Agents seized the antennas from DaVinci, i.e., September 30, 2014." Defendant asserts that "[t]he United States classified embedded features of the ten JASSM Antennas and determined that they required protection against unauthorized disclosure in the interests of national security." (alteration added). Defendant asserts that "[u]pon being presented with Exhibit F, the September 23, 2014 Letter, DaVinci had reason to believe that the JASSM Antennas contained information 'related to the national defense.'" (alteration added). Defendant states that the September 23, 2014 Letter "expressly notified DaVinci that the JASSM Antennas were being seized pursuant to 18 U.S.C. § 793(d), that the Government's agents were 'fully authorized to take possession' of them, and that DaVinci's delivery of the JASSM Antennas was being 'made under compulsion of law pursuant to 18 USC [sic] 793(d).'"(alteration added; internal citation omitted). Defendant, therefore, argues that "DaVinci had no right to possess the antennas after the Government made a demand for them pursuant to the Espionage Act," and "consequently, no right to their fair market value." Defendant claims that "[b]ecause the JASSM Antennas contained classified information, they related to the national defense under the Espionage Act, 18 U.S.C. § 793(d), DaVinci's 'title and possession were completely vulnerable. All that was needed to destroy them was an official demand that possession be surrendered.'" (alteration added; citation omitted).

Defendant further argues, citing the "In Chambers Minutes" of the United States District Court for the Central District of California, Docket No. 38, dated April 25, 2017, that "DaVinci did not possess a cognizable property interest in the ten JASSM antennae" because, "[a]s the district court found, and Da Vinci did not dispute, the ten JASSM Antennas 'were seized because they contained classified information posing a danger to the national defense' and their seizure had a 'national security purpose.'" (alteration added; internal citation omitted). Defendant argues that "DaVinci has no possessory interest in the ten JASSM Antennas because as the district court found, and DaVinci did not dispute,

'they contained classified information posing a danger to the national defense' and their seizure had a 'national security purpose.'" (internal citation omitted).

Defendant also refers to the July 22, 2014 Memorandum of Air Force Lieutenant Colonel Russell, filed with the District Court, but as noted above, not submitted separately to this court, to assert that the antennas were classified at the time the Air Force Special Agents seized the antennas on September 30, 2014. Lieutenant Colonel Russell's July 22, 2014 Memorandum states:

> I am the Director of Air Force Special Programs and have been designated as the Original Classification Authority (OCA) for SENIOR RODEO under the authority of Executive Order 13526 as delegated by the Secretary of the Air Force. Based upon an AFOSI [Air Force Office of Special Investigations] request, and in my capacity as OCA official, I have coordinated with the appropriate technical experts and reviewed the documents and references in accordance with the SENIOR RODEO Security Classification Guide (SCG), dated 31 Oct 2007. I have determined the embedded features of the JASSM GPS Antennas are classified at the SECRET and SECRET//SPECIAL ACCESS REQUIRED level and that their disclosure could provide adversarial nations with critically protected information.

(capitalization in original). Additionally, defendant attached to its reply brief on the motion to dismiss plaintiff's "Second Amended Complaint" in this court, the Declaration of Colonel Bohenek, executed on March 2, 2023, which states generally in pertinent part:

> An SCG [Security Classification Guide] for the JASSM program was first approved and promulgated on October 31, 2007. It classified as SECRET, critical program information contained in and conveyed by the JASSM GPS antennas at issue in this case. That same critical program information classified as SECRET in October 2007, has remained classified, continuously and without interruption, from 2007 to the present.

> An SCG also provides guidance on how to properly dispose of property containing classified information or capable of revealing it. The JASSM GPS antenna, if intact and not appropriately disposed of via an SCG-authorized destruction technique, remains classified given the information it contains and is capable of conveying.

(alteration added; capitalization in original). Defendant claims that plaintiff's "allegation that information contained in the JASSM Antennas was not classified until July 22, 2014, is not in DaVinci's complaint, and also is incorrect."

In response, plaintiff argues:

> According to the timeline outlined in the second amended complaint and attachments thereto (and uncontroverted by the defendant) the JASSM

Antennae at issue became classified during the course of negotiations with the defendant to purchase them. It is incredible that the government had a right to seize the JASSM Antennae at all times during their interaction with DaVinci. It is obvious, and necessarily a matter for further factual investigation, to determine the motivation of the Defendant in having the JASSM Antennae reclassified and seized when it appeared they were not going to be able to convince DaVinci to significantly lower their asking price. **The timeline of events can easily be read to indicate that a taking occurred at the moment the Defendant signed an order reclassifying the JASSM Antennae.** Although the Defendant seems comfortable arguing that 'the authorized seizure of property as an exercise of enforcement of public laws is not a taking' here the Defendant created the authority to seize. Before that occurred, DaVinci was in lawful possession of the JASSM Antennae and had warehoused and marketed the same for more than a year. The timeline of events can easily be read to indicate that the Defendant became aware of the Plaintiff's ownership as a result of that marketing or by following a chain of sale. There are questions as to why the JASSM Antennae were not reclassified at the inception of the Defendants [sic] interest in them. That would lend more support a [sic] similar to contraband argument or no lawful possession argument. But at a motion to dismiss stage, before any factual record can be created, the Defendant's arguments are threadbare illusion.

(emphasis in original; alterations added; internal reference omitted). At oral argument, plaintiff's counsel summarized plaintiff's argument, stating:

And the negotiations were going on between 2013 and '14. I think June of '14, they broke down. So this is the time -- what we're saying is that these antennas were properly sold. They were properly sold by -- as surplus. The Government recognized that they were properly sold. The Government was negotiating to buy them back. They had no -- there was no indication during the 12 months prior to the seizure that they were classified [brief audio lapse]. And, then, on July 22nd, 2014, there's a letter by Steven Russell, which says that these antennas are classified. So they were classified on July 22nd, 2014.

(alteration in original). Additionally, plaintiff contends that its "position has continuously been that the JASSM antennas at issue were only classified in a post-hoc effort and misuse of the security and classification process to avoid legitimate procurement methods." (emphasis in original).

Plaintiff's "Second Amended Complaint," supported by plaintiff's invoice, included as an exhibit to the "Second Amended Complaint," alleges that plaintiff validly purchased the ten JASSM antennas on the free market "from BPB Surplus for the sum of $3,000." According to plaintiff's "Second Amended Complaint" filed in this court, BPB Surplus purchased the ten JASSM antennas from a private company, Avatar Unlimited, which

purchased the ten JASSM antennas "from Lockheed Martin as part of a bulk sale of surplus parts." According to the "Second Amended Complaint" in this court, "[f]rom approximately August 2013, Plaintiff DaVinci publicly advertised the 10 JASSM Antennae for sale on the surplus parts market." (alteration added). Plaintiff argues that the antennas had been a part of its "inventory for over a year, all while being listed and marketed as having a fair market value of approximately $125,000 per unit, which was far cheaper than similar replacement JASSM Antennas sold by the original manufacturer." According to plaintiff, and as suggested by the record now before the court, defendant appears to have recognized plaintiff had possession of the ten JASSM antennas during defendant's price negotiations with plaintiff's representatives as reflected in Captain Lewis' June 2, 2014 email which stated: "The government would like to extend an offer of $7,359 for the purchase of the 10 JASSM GPS Antennas. This is based on the price originally paid for the purchase of the lot of military equipment from DCMA. We're looking forward to hearing from you." (alteration added). In his June 4, 2014 email, Captain Lewis also stated, "I have been assigned the purchase of the GPS Antennas in your possession," and asked plaintiff to "let me know how you would like to proceed." In his June 4, 2014 response, Mr. Niemans of DaVinci's Sales Department stated:

> We sent an email a few days ago responding to your offer. $75,000.00 each is the best price we are going to be able to go on these antennas; that is the price after giving the USAF a 40% discount off the price we were originally quoting these units out at. [sic] $7,359.00 for the lot of 10 antennas is just far too low to consider.

(alteration added). In response, Captain Lewis wrote to Mr. Niemans:

> I'm sure you understand that the government must determine the prices it pays for parts to be fair and reasonable as the taxpayer depends on us to be good stewards of their dollars. Seeing that these units only cost a fraction of that amount brand new, the government is unwilling and unable to accept that price. I encourage you to propose a more reasonable price so we both can benefit.

On June 11, 2014, Brandi Clark, a civilian contract specialist for the Air Force, emailed Mr. Niemans, stating: "I wanted [sic] follow up with you regarding Capt. Lewis' last email concerning the JASSM GPS Antennas. I was wondering if the Government can expect a fair counter offer [sic] from DaVinci Aircraft in the near future." (capitalization in original; alterations added). That same day, according to the "Second Amended Complaint," plaintiff issued the Air Force a quotation of $600,000.00 for the antennas.

Defendant asserts, through Colonel Bohenek's March 2, 2023 Declaration, that the security classification guide

> for the JASSM program was first approved and promulgated on October 31, 2007. It classified as SECRET, critical program information contained in and conveyed by the JASSM GPS antennas at issue in this case. That same

43

> critical program information classified as SECRET in October 2007, has remained classified, continuously and without interruption, from 2007 to the present.

(capitalization in original). Colonel Bohenek's March 2, 2023 Declaration, however, does not provide definitive evidence of when the specific antennas at issue in this case were classified, de-classified, or demilitarized, and released to surplus sales. Nor does Colonel Bohenek's March 2, 2023 Declaration reconcile the fact that the supposedly classified antennas were sold multiple times and the government initially sought to purchase the antennas at issue in this case from the plaintiff rather than immediately seize the antennas pursuant to the national defense under the Espionage Act, 18 U.S.C. § 793(d). In fact, the United States Court of Appeals for the Ninth Circuit in its decision, stated:

> Under the subcontract [between Lockheed Martin and Ball Aerospace], the Antennas were <u>considered unclassified hardware and therefore not subject to the security requirements of the Department of Defense or U.S. Air Force for classified data and hardware</u>. They did not require demilitarization and were authorized by the U.S. Air Force for public sale, excluding export, around March 2013.

<u>DaVinci Aircraft, Inc. v. United States</u>, 926 F.3d at 1120 (emphasis and alteration added).

Defendant also refers to the July 22, 2014 Memorandum of Air Force Lieutenant Colonel Russell, attached to the District Court filings to assert that the antennas were classified at the time the Air Force Special Agents seized the antennas on September 30, 2014. On its face, Lieutenant Colonel Russell's July 22, 2014 Memorandum does not address the claim that the antennas had been classified since 2007 and were later mistakenly sold without first being demilitarized. Instead, Lieutenant Colonel Russell's Memorandum raises an issue regarding whether plaintiff's <u>post-hoc</u> classification argument, specifically that the antennas were determined to be unclassified, not requiring demilitarization, and then, after being lawfully sold to plaintiff, but before being resold by plaintiff, the Air Force issued a classification determination, has merit.

Defendant argues that "[i]n this case, there is no statute that provides for judicial review of the Executive's determination that the JASSM Antennas were classified." (alteration added; citation omitted). While the court agrees, the court also notes that the Executive Branch discretion to classify information is not without limit. <u>See</u> Proclamation No. 13526, 75 Fed. Reg. 707, 710 (Dec. 29, 2009) (prohibiting information from being classified to: "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security"). The court, however, may determine when the antennas were determined to be classified without reviewing the Air Force's determination to classify and, in this case, the court may review the when the antennas were determined to be classified relevant to the viability of plaintiff's takings claim. Additionally, the Ninth Circuit referenced Executive Order 13,526 in its decision, stating "the government submitted a declaration

from Martin D. Hemmingsen, Program Element Monitor for Air Force Special Programs, attesting that in July 2014, the Antennas were classified as 'SECRET' and 'SECRET/SPECIAL ACCESS REQUIRED' level in accordance with Executive Order 13,526." DaVinci Aircraft, Inc. v. United States, 926 F.3d at 1121 (capitalization in original). The court also notes that Executive Order 13,526 is dated December 29, 2009, and, therefore, was issued after 2007, a date that defendant argues the antennas were classified. The Hemmingsen declaration was not provided to this court, although it was included with the defendant's filings in the United States District Court for the Central District of California and referenced in defendant's motion to dismiss the "Second Amended Complaint" in this court.

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56 (citing Swierkiewicz v. Sorema N.A., 534 U.S. at 508 n.1))); see also Fisher v. United States, No. 2024-1167, 2025 WL 2314994, at *3 (Fed. Cir. Aug. 12, 2025) ("We accept as true all well-pled factual allegations in the operative complaint and draw all reasonable inferences in favor of the plaintiffs."). The facts alleged by plaintiff in the "Second Amended Complaint" and the findings by the United States Court of Appeals for the Ninth Circuit based upon the Ninth Circuit's assumptions about the status of the antennas at the time of their sale, for the purposes of the motion currently before the court, are sufficiently plausible as alleged to establish that plaintiff may have had, at one time, the right to possess, use, or sell the antennas prior to the government taking possession of the antennas on September 30, 2014. Moreover, the uncorroborated declarations provided by defendant are insufficient, at this time, to overcome the presumption in favor of plaintiff on a motion to dismiss.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss Counts I and II of plaintiff's current complaint in this court is **GRANTED** and Counts I and II of plaintiff's current complaint are **DISMISSED**. Defendant's motion to dismiss Count III of plaintiff's current complaint is **DENIED**. The court will schedule further proceedings on plaintiff's takings claim by separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

45